UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| LRP MUSHROOMS, INC. | : | |
| Debtor | : | Bankruptcy No. 09-18529 |

................................................

MEMORANDUM

................................................

The chapter 11 debtor in possession, LRP Mushroom, Inc., filed a motion to assume and reject certain non-residential real property leases under 11 U.S.C. § 365.  An objection to this motion was filed by Mr. James Fieni.  The official committee of unsecured creditors filed a response requesting that this motion be "deferred" until its counsel had the opportunity to review the leases at issue, as well as the debtor's payment histories.

After this motion was filed, the debtor stated in open court that it had reached an agreement with two of the lessors, C&L Rentals and D&O Mandfredini, to postpone the issue of assumption of those two leases until confirmation of a chapter 11 plan.  (No such agreements have been filed with this court.)  Thus, it no longer seeks any relief as to these lessors.  As to the remaining lessor, Mr. James Fieni, the debtor seeks to assume a lease as to mushroom "plant 1" only and reject the leases as to "plant 2" and "plant 3." The official committee of unsecured creditors now supports such relief.  Mr. Fieni remains opposed, for reasons addressed below.

I.

After an evidentiary hearing, the following facts were proven.

A.

LRP Mushrooms, Inc. is an entity that, as of the date of its chapter 11 bankruptcy filing on November 5, 2009, operated a number of mushroom farms in or near Landenberg and Avondale, Pennsylvania.

In June 1993, Mr. James Fieni entered into a lease agreement with "Lucio R. Pizzini, Sr. and Lucio R. Pizzini, Jr. trading as LRP Mushrooms." Ex. D-6. The leasehold consisted of "four double mushroom houses and dirt shed situate on Penn Green Road, Landenberg, Pennsylvania." Id. Because of its location in relation to other mushroom houses owned by Mr. Fieni, the parties now refer to this leasehold as "plant 3."

This plant 3 lease commenced on July 1, 1993 and was scheduled to terminate on June 30, 2003. Id. The rental charge was established at $2,000 "per fill 4 Times a year payable in per fill installments." Id. The lessees were granted the right to terminate the lease upon six months notice to the lessor. They also had a right of first refusal to purchase the leasehold, as well as the duty to maintain the plumbing, electrical fixtures and other fixtures in good condition. Id.

Under the July 1993 lease agreement, the lessees were also responsible to pay for electricity "for the [water] well, while the lessor and lessees were equally

2

responsible for the cost of repairs and maintenance to this well." Id.[1]  The lessees were
liable for the payment of all utility services.  The July 1993 lease further provided that the
lessees "shall take possession of the mushroom houses 'full' and at the end of the term the
houses shall be 'full.'" Id.

In February 1998, the plant 3 lease was amended.  Ex. D-6.  By this
amendment, Messrs. Pizzini assigned their interest in this lease to the debtor, LRP
Mushrooms, Inc., stated to have been incorporated in 1995.  The term of the plant 3 lease
was extended until June 30, 2008.  The rent due was increased in specified increments,
stated to become $800 per fill per double beginning in July 1, 2001, with the doubles to
be filled approximately four times per year.  Finally, the amendment "ratif[ied] and
reaffirm[ed] the balance of the lease provisions of the June 1993 lease."  Ex. D-6.

A second amendment to the plant 3 lease was signed by the debtor and Mr.
Fieni on October 14, 2006.  Ex. D-1.  By this second amendment, the lease term was
extended until June 30, 2015.  The rent was increased, effective January 2007, to $1,100
per fill per double, with the parties anticipating that such fills would occur approximately
4.5 times per year.  Again, the non-amended terms of the June 1993 were ratified.  Id.

In March 1998, the debtor and Mr. Fieni entered into another lease of "four
(4) double mushroom houses situate on Penn Green Road (and the closest to the
intersection of Starr Road), Landenberg, Pennsylvania."  Ex. D-7.  Owing to its location,
the parties now refer to this leasehold as "plant 1."  This lease agreement commenced in

---

[1]As mentioned below, James Fieni and his brother Gabriel Fieni testified that the
well located on the leasehold for plant 3 has not been operational since 1970.  Although the July
1993 lease does not so state, it is possible that the well referred to is located on the leasehold for
plant 2.

March 1998 and was scheduled to terminate in March 2008.  The rent originally due for plant 1 was $200 per month per double, payable "when said doubles are filled."  Id.

The plant 1 lessee had a right of first refusal to purchase the  leasehold, along with the right to terminate the lease upon six months notice to the lessor.  Furthermore, the plant 1 leasehold was rented in a "cleaned out" condition, and was to be restored to the lessor at the termination of the lease in the same condition.  The lessee was responsible for the payment of all utility services.  Id.

On October 14, 2006, the parties signed an amendment to the plant 1 lease agreement.  Ex. D-3.  The amendments stated that the lessee intended to make improvements to the leasehold, to which the lessor consented.  It also provided that the term of the lease was extended until March 31, 2015.  Moreover, the rent was increased to "$1,100 per double per fill."  The amendment contained provisions entitling the lessee to compensation from a buyer of the leased premises in the event the lessee did not exercise its right of first refusal.  Finally, all non-amended lease terms from the February 1998 lease were ratified and reconfirmed.  Ex. D-3.

In addition to the two agreements stated above, in February 1999, the debtor and Mr. Fieni entered into a lease of "four (4) double mushroom houses and one (1) single mushroom house situate on the north side of Penn Green Road, Landenberg, Pennsylvania."  Ex. D-2.  The parties now refer to this leasehold as "plant 2."

The lease term for plant 2 was for ten years beginning on March 1, 1999 and ending on February 28, 2009.  The rent due was $200 per double per month and $100 per single per month, but payable "when said mushroom houses are filled."  Ex. D-2.

4

Plant 2 was leased in a "cleaned out" condition and was to be returned to the lessor in the same condition.  The lessee was liable for the payment of all utilities.  Id.

The plant 2 lease was also amended on October 14, 2006.  Ex. D-2.  The amendment extended the term of the lease until February 28, 2016.  Beginning January 2007, the rent payable was increased to $1,000 per month.  Id.  Non-amended terms of the February 1999 lease agreement were ratified and reconfirmed.

Thus, in summary, plant 3 was leased in 1993 and, after its second amendment in October 2006, this leasehold is due to expire in June 2015.  The current rent, as agreed by the parties, is a total of $4,400 per fill for the four double mushroom houses, with the lease expressly anticipating that there would be about 4.5 fills per year.  The plant 1 lease commenced in March 1998, and after its amendment in October 2006, will terminate on March 31, 2015, shortly before the plant 3 lease ends.  The rent is also $4,400 per fill for the four double mushroom houses, but the number of anticipated fills per year is not specified.  Finally, plant 2 was leased as of March 1, 1999, and after the October 2006 amendment, it will expire on February 28, 2016.  The rent for plant 2 is $1,000 per month.

These three leases contain many similar provisions—e.g., the lessee is responsible for all utilities; has a right of first refusal to purchase the leaseholds—and some that vary.  For example, the testimony revealed that each plant has its own electric usage meter, and each plant has a well on its grounds. Yet only the plant 3 lease makes any mention of a well, and simply provides that its maintenance and repairs would be paid equally by lessee and lessor.

5

Furthermore, although not mentioned in any lease, testimony was in agreement that only the well on plant 2 is operational, and is used to provide water to the other plants.  Lessor James Fieni and his brother Gabriel testified[2] that the well on plant 1 was abandoned around 1950, and the well on plant 3 abandoned around 1970.  Also not mentioned in any lease is that the electric service connected to plant 2 also provides electricity to a farmhouse that is the residence of the lessor.  The debtor has paid for such service.

The debtor also arranged to have used compost from the mushroom houses "dumped" on the lessor's non-leased property for an additional fee of $75 per truckload. There is no dumping provision in any lease agreement.


B.


As mentioned above, the October 2006 amendment to the plant 1 lease refers to intended improvements to be made by the debtor/lessee.  Such improvements were made, including an upgrade to the then existing air conditioning system in plant 1. Plants 2 and 3 have not been upgraded in a number of years.  Mr. Pizzini, Jr. testified credibly that those two plants are no longer suitable for the debtor's farming purposes without improvements, particularly improvements to their air conditioning systems. (Without a functioning air conditioning system, the temperature of the mushroom houses

---

[2]Owing to Mr. James Fieni's medical condition, he was permitted to testify in open court by contemporaneous transmission from a different location (via video conferencing equipment) pursuant to Fed. R. Bankr. P. 9017 (incorporating, inter alia, Fed. R. Civ. P. 43(a)). See generally Sallenger v. City of Springfield, 2008 WL 2705442 (C.D. Ill. 2008).

becomes too hot for farming in the warmer months of the year.)  He further testified

credibly that the debtor has insufficient funds to make these improvements and that,

without the requisite improvements, continued operation of plants 2 and 3 is

uneconomical.

      If the debtor were to reject the plant 2 lease, it anticipates being able to

restore the well on plant 1 for water use at that leasehold, and to do so for a few thousand

dollars in cost.  Mr. Pizzini, Jr. based his estimate on repairing the well on plant 1 upon

the debtor's cost of restoring and renovating the well on the plant 2 leasehold.  Mr.

Gabriel Fieni believes the cost to restore the well on the plant 1 leasehold would be much

higher, if possible at all.

      Plant 1, with its recent improvements and with a sufficient water supply, is

suitable for year-round mushroom farming.  Mr. Pizzini anticipates 4.5 fills per year from

this plant, with a profit of approximately $10,000 to $20,000 per fill.[3]

## C.

      The parties agree that the debtor was delinquent in rent payments on plant 1

(as well as plants 2 and 3), but disagree as to the amount owed.  The debtor contends that

he owed the lessor a total of $174,925 for the three year period just prior to its bankruptcy

filing for all three plants, including dumping fees, and that he paid $142,900, leaving a

---

[3]He testified at one point that the debtor earns about $3,000 per double per fill
from plant 1 or, with four doubles, approximately $12,000.  He later estimated the debtor's gross
revenues at $160,000 per fill with total expenses between $140,000 and $150,000.  Based upon
this testimony, the creditors' committee counsel was persuaded that the operation of plant 1
would be profitable.

balance of $32,025.  Ex. F-3.  Of that balance, he estimates that approximately $15,000 is attributable to plant 1.

Mr. Fieni's brother Gabriel testified that, beginning in 2008, he assisted the lessor by invoicing the debtor, receiving and depositing lessee checks, and noting payments on the invoices.  By his calculation, the debtor failed to pay for six fills from plant 1 prior to its bankruptcy filing.  See exs. F-6, F-7.  At $4,400 per fill, this would total $26,400 prepetition.

My resolution of this issue is made difficult by the absence of copies of cancelled checks and corroboration of plant fill dates.  Upon review of all of the documents provided and consideration of the testimony offered, the preponderance of the evidence (based upon my calculations attached as an appendix to this memorandum) demonstrates that the debtor failed to pay for four plant 1 fills prior to its bankruptcy filing, for a prepetition delinquency of $17,600.[4]

---

[4]From the evidence presented I conclude that plant 1 was filled 14 times between December 29, 2006 and November 5, 2009.  Not all of the checks paid to the lessor reflect a corresponding fill date, and the rent owing for plants 1 and 3 is the same.  I therefore applied each debtor payment in a multiple of $4,400 to plants 1 and 3 in the order in which they were filled.  By this method, all but $1,600 from the check in the amount of $10,400 is allocated.  Under state law, this sum may have been applied by the lessor to unpaid dumping fees, or delinquent rent on plants 2 or 3:

> [I]t is a general rule in Pennsylvania law that where a debtor owes more than one debt to a creditor, the debtor has the first right to specify the particular debt to which a payment is to be applied.  If the debtor does not exercise this right, the creditor may apply the money to one or more of the debts in any manner in which he chooses.  If neither the debtor or the creditor has made an application of the payment, then the law will make an application.

Uhl Const. v. Fidelity & Deposit Co. of Maryland,  371 Pa. Super. 520, 526 (1988).

Furthermore, the debtor acknowledges that he has not tendered any funds in connection with plant 1 since this bankruptcy case commenced.  Ex. D-5.  I will assume that two fills should have occurred by the date of this memorandum, placing the postpetition obligation under section 365(d)(3) at $8,800 (subject to the debtor's contention in its adversary proceeding that no postpetition rent is owing given the lessor's actions in connection with plant 1).   Therefore, the total delinquency on plant 1 at the time of trial on this contested matter is between $17,600 and $26,400.

The debtor proposes to cure this delinquency at a rate of $2,000 per month. Thus, it would take slightly more than 13 months to become current, less any reduction in postpetition rent due.[5]

II.

Section 365(a) of title 11 permits a bankruptcy trustee to assume or reject unexpired leases and executory contracts.  Section 1107(a) grants to a chapter 11 debtor in possession, such as the debtor in this contested matter, the rights of a bankruptcy trustee under section 365.  See In re Kiwi Intern. Air Lines, Inc., 344 F.3d 311, 317-18 (3d Cir. 2003); In re CellNet Data Systems, Inc., 327 F.3d 242, 246 (3d Cir. 2003); see also In re Nickels Midway Pier, LLC, 255 Fed. Appx. 633, 634 n.2 (3d Cir. 2007) (non-precedential).

---

[5]Counsel for the creditors' committee argued that the lease for plant 1 requires payment of rent only upon filling the mushroom houses thereon, and the lease does not require the lessee to fill plant 1.  Thus, he maintains that no rent is owing postpetition.
The debtor, however, conceded at the hearing that he had an implicit, good faith obligation to fill plant 1 as able, which is about 4 times annually.

Section 365(b) establishes requirements for assumption.  As explained by

the Third Circuit Court of Appeals:

> Section 365 enables the trustee to maximize the value of the
> debtor's estate by assuming executory contracts and
> unexpired leases that benefit the estate and rejecting those that
> do not. 11 U.S.C. § 365(a); see also Stewart Title Guar. Co. v.
> Old Republic Nat'l Title Ins. Co., 83 F.3d 735, 741 (5th Cir.
> 1996) (section 365 "allows a trustee to relieve the bankruptcy
> estate of burdensome agreements which have not been
> completely performed"); see generally 2 Norton Bankruptcy
> Law & Practice 2d § 39:1 (William L. Norton, Jr. ed., 1997)
> [hereafter "Norton"].
>
> Because executory contracts and unexpired leases involve a
> continuing relationship between the debtor and other parties,
> section 365 "gives special treatment to rights and liabilities
> flowing from these contracts and leases." Id. § 39:1, at 39-6.
> If there has been a default in an executory contract or
> unexpired lease, the trustee may not assume it until the
> trustee: (1) cures or provides adequate assurance that it will
> promptly cure the default; (2) compensates or provides
> adequate assurance of prompt future compensation for actual
> pecuniary loss resulting from the default; and (3) provides
> adequate assurance of future performance under the contract
> or lease.  11 U.S.C. § 365(b)(1)(A), (B), (C).  Once the trustee
> satisfies these requirements it may assume the contract or
> lease, but it must do so in its entirety.  See Stewart Title Guar.
> Co., 83 F.3d at 741.

In re Rickel Home Centers, Inc., 209 F.3d 291, 298 (3d Cir. 2000).

If a chapter 11 debtor in possession elects to assume an unexpired lease, it

must assume the lease with all its provisions.  See, e.g., In re CellNet Data Systems, Inc.,

327 F.3d 242, 249 (3d Cir. 2003) ("This election [to assume] is an all-or-nothing

proposition—either the whole contract [or lease] is assumed or the entire contract [or

lease] is rejected.").  That is, the lease must be assumed cum onere— i.e., with its benefits

and its burdens.  See N.L.R.B. v. Bildisco and Bildisco, 465 U.S. 513, 531-32 (1984)

(citing In re Italian Cook Oil Corp., 190 F.2d 994, 996 (3d Cir. 1951)).  Moreover, upon

10

assumption of a lease under section 365, the debtor's liabilities thereunder become

administrative expenses entitled to priority under sections 503(b) and 507(a)(2).  See, e.g.,

N.L.R.B. v. Bildisco and Bildisco, 465 U.S. at 532; In re Trans World Airlines, Inc., 145

F.3d 124 (3d Cir. 1998).

> If the lease is assumed, i.e., the debtor and the court having
> agreed that the continuation of the lease is in the best interest
> of the debtor's reorganization and continuation, the debtor is
> entitled to receive the benefits under the lease but, at the same
> time, is responsible for performing its obligations thereunder.
> In re Columbia Gas Sys., 50 F.3d 233, 238-39 & n. 8 (3d Cir.
> 1995).  Should the debtor breach thereafter, all future
> payments due under the remainder of the lease become
> administrative expenses with administrative priority.  Id.

Id., 145 F.3d at 136; see also Matter of Taylor, 913 F.2d 102, 106-07 (3d Cir. 1990)

("[T]he "assume or reject" dichotomy means simply that if the trustee wishes to obtain for

the estate the future benefits of the executory portion of the contract, the trustee must also

assume the burdens of that contract, as an expense of bankruptcy administration ( i.e.,

having priority over all pre-bankruptcy claims of creditors)).[6]

    As noted above, section 365 affords a debtor in possession the ability to

assume leases beneficial to the bankruptcy estate (if it can meet the requirements of

section 365(b)) and to reject those that are not, thereby maximizing distributions to

creditors and equity holders.  See Cinicola v. Scharffenberger, 248 F.3d 110, 119  (3d Cir.

2001).  "Though § 365 benefits the debtor by allowing it to assume contracts beneficial to

the estate, it also puts a specific limitation (the adequate assurance requirement) on which

---

[6]Indeed, the Second Circuit Court of Appeals admonished that assumption by
debtors of long-term leases should be undertaken with caution, as the interests of general
unsecured creditors may be harmed thereby.  In re Klein Sleep Products, Inc., 78 F.3d 18, 29 (2d
Cir. 1996).  In this contested matter, counsel for the committee of unsecured creditors expressly
supported the motion to assume the lease of plant 1, by statements made in open court.

contracts may be assumed, providing a measure of protection for the non-debtor." In re

Texas Health Enterprises Inc., 72 Fed. Appx. 122, 126 (5th Cir. 2003).

 Although assumption of a lease or executory contract requires court

approval, the standard to be applied is the "business judgment" test. See, e.g., NLRB v.

Bildisco & Bildisco, 465 U.S. 513, 523 (1984).

> The language of the code is permissive; it is up to the trustee
> [or debtor in possession] to decide whether to assume or reject
> an executory contract. . . .  The only limitation on the trustee's
> discretion is that it is subject to court approval.  However,
> since courts review a trustee's decision to assume or reject a
> contract under a traditional "business judgment" standard, the
> scope of review in this area is narrow.

In re Gardinier, Inc., 831 F.2d 974, 975 n.2 (11th Cir. 1987) (citations omitted); see, e.g.,

In re Penn Traffic Co., 524 F.3d 373, 383 (2d Cir. 2008); In re Pomona Valley Medical

Group, Inc., 476 F.3d 665, 670 (9th Cir. 2007); 3 Collier on Bankruptcy, ¶ 365.03[2]

(15th ed. rev. 2009).  Application of the business judgment standard:

> entails a determination that the transaction is in the best
> interest of the estate.  See Nostas Assocs. v. Costich (In re
> Klein Sleep Prods., Inc.), 78 F.3d 18, 25 (2d Cir.1996)
> ("Th[e] decision [to allow a debtor to assume an unexpired
> lease] required a judicial finding—up-front—that it was in the
> best interests of the estate (and the unsecured creditors) for
> the debtor to assume the lease. . . ."). Where the trustee's
> request is not manifestly unreasonable or made in bad faith,
> the court should normally grant approval "[a]s long as [the
> proposed action] appears to enhance [the] debtor's estate."
> Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303,
> 1309 (5th Cir. 1985) (quotation omitted).

In re Food Barn Stores, Inc., 107 F.3d 558, 567 (8th Cir. 1997); see In re Pittsburgh

Sports Associates Holding Co., 239 B.R. 75, 87 (Bankr. W.D. Pa. 1999), vacated on

stipulation, 1999 Bankr. LEXIS 1872 (Bankr. W.D. Pa. Nov. 23, 1999); see also In re

Philadelphia Newspapers, LLC, 424 B.R. 178, 182 (Bankr. E.D. Pa. 2010).

12

III.


In opposing the debtor's request to assume the lease for plant 1 and reject

the leases for plants 2 and 3, Mr. Fieni raises a number of arguments.  For the following

reasons, I find the lessor's contentions unpersuasive.


A.


First, Mr. Fieni maintains that the debtor's request is untimely under section

365(d)(4).  That provision states:

> (A) Subject to subparagraph (B), an unexpired lease of
> nonresidential real property under which the debtor is the
> lessee shall be deemed rejected, and the trustee shall
> immediately surrender that nonresidential real property to the
> lessor, if the trustee does not assume or reject the unexpired
> lease by the earlier of--
>
> > (i) the date that is 120 days after the date of the
> > order for relief; or
> >
> > (ii) the date of the entry of an order confirming
> > a plan.
>
> (B)(i) The court may extend the period determined under
> subparagraph (A), prior to the expiration of the 120-day
> period, for 90 days on the motion of the trustee or lessor for
> cause.
>
> (ii) If the court grants an extension under clause (i), the court
> may grant a subsequent extension only upon prior written
> consent of the lessor in each instance.

13

The instant chapter 11 case commenced on November 5, 2009, which, by virtue of section 301(b), constitutes the date of the order for relief.  Thus, the deadline for assumption of a commercial lease with Mr. Fieni was 120 days later: March 5, 2010.

The debtor filed a motion to extend this deadline on December 23, 2009, which motion was granted without opposition on February 17, 2010.  The extended deadline was April 5, 2010.  Despite this extension, the debtor filed the present motion on February 16, 2010, well within the time period for acting under section 365(d)(4) had expired.

Mr. Fieni does not contend that section 365(d)(4) requires that the debtor's motion to assume and reject be determined on or before April 5, 2010.  See, e.g., In re Deane Communications, Inc., 1994 WL 840976, at *4 (D. Colo. 1994); In re C & C TV & Appliance, 103 B.R. 590, 593 (E.D. Pa. 1989); In re National Paragon Corp. 74 B.R. 180 (E.D. Pa. 1987); In re By-Rite Distributing, Inc., 55 B.R. 740, 744-45 (D. Utah 1985); 3 Collier on Bankruptcy, ¶ 365.04[3]d] (15th ed. rev. 2009) ('[M]ost courts have required that a trustee or debtor in possession act before the expiration of the 60-day period, but have held that court approval of a trustee or debtor in possession's motion to assume may be granted after the expiration of the period.").  Instead he argues that the debtor's original motion, and aborted settlement of that motion on March 31, 2010, sought to assume all of the Fieni leases, and that the debtor's current position—seeking assumption

14

of only the plant 1 lease and rejection of the leases of plants 2 and 3—is an untimely amendment thereto.[7]

For reasons detailed below, I find that this chapter 11 debtor has consistently and timely sought to assume only the plant 1 lease. Moreover, the parties' unsuccessful settlement efforts do not render this motion untimely. See generally In re Carlisle Homes, Inc., 103 B.R. 524, 536 (Bankr. D.N.J. 1988) (filing of pleading that "unequivocally" reflects the debtor's intention to assume within the deadline set forth in section 365(d)(4) is sufficient).

B.

Mr. Fieni also argues vigorously that there is no separate lease for plant 1. Instead, he maintains that the debtor has "judicially admitted" that all three mushroom plants are rented under one lease. Alternatively, he maintains that the proximity of the plants to each other, and their shared use of water, caused the parties to treat the three mushroom plants as though under one lease. In support thereof, he notes that the debtor

---

[7]At a hearing held on March 31st, the parties reported that the debtor's motion and Mr. Fieni's objection thereto had been resolved, subject to completion of a written agreement, which would then be submitted to this court on motion under Bankruptcy Rule 9019. Committee counsel stated that until there was a complete written agreement that he could review with his committee, he could take no position on any proposed settlement.

Unfortunately, the parties were unable to complete a written agreement by the deadline established, and no settlement motion was ever filed. Some weeks after the deadline, at the request of the debtor this contested matter was relisted for an additional hearing on the merits (which relisted hearing was then postponed at the request of the objector), with the conclusion of the evidentiary hearing further delayed at the request of both parties in order to obtain the testimony of Messrs. Fieni.

would sometimes pay the rent for all three plants with one check and has deducted certain charges involving one plant from the rent due from the other.

In determining whether there were three separate leases of the three mushroom plants from Mr. Fieni, or just one lease, I note that all three plants are located in Pennsylvania, and the lease agreements were all entered into in Pennsylvania. Therefore, Pennsylvania state law governs this issue. See J.C. Penney Co., Inc. v. Giant Eagle, Inc., 813 F. Supp. 360, 367 (W.D. Pa. 1992); In re Karfakis, 162 B.R. 719, 726 (Bankr. E.D. Pa. 1993) (citing Restatement (Second) Conflict of Laws §§ 6, 188 (1971)).

Under Pennsylvania law, leases are treated as contracts and thus are controlled by principles of contract law. See, e.g., Fleetway Leasing Co. v. Wright, 697 A.2d 1000, 1002 (Pa. Super. 1997); Cusamano v. Anthony M. DiLucia, Inc., 281 Pa. Super. 8 (1980). The Third Circuit Court of Appeals has explained that Pennsylvania construes contracts based upon the parties' intent, with such intent generally determined by the language of the contract:

> In Pennsylvania, [c]ontract interpretation is a question of law that requires the court to ascertain and give effect to the intent of the contracting parties as embodied in the written agreement. Courts assume that a contract's language is chosen carefully and that the parties are mindful of the meaning of the language used. When a writing is clear and unequivocal, its meaning must be determined by its contents alone. Dep't of Transp. v. Pa. Indus. for the Blind & Handicapped, 886 A.2d 706, 711 (Pa. Cmwlth. 2005) (internal citations and quotation marks omitted).

In re Old Summit Mfg., LLC, 523 F.3d 134, 137 (3d Cir. 2008).

Indeed, this explanation of Pennsylvania law applies equally to the interpretation of leases.

> It is well settled law that a lease agreement is in the nature of
> a contract, and is controlled by principles of contract law. . . .
> When we, as a reviewing court, are asked to interpret or
> review the meaning of a contract, the intent of the parties is
> paramount, and our objective is to ascertain the parties' intent
> as it is manifestly expressed in the agreement itself. . . . The
> intent of the parties to a written contract is regarded as
> embodied in the writing itself. . . .  In the absence of technical
> terminology, we give the words used in the agreement their
> plain and ordinary meaning.

Warren v. Greenfield, 407 Pa. Super. 600, 606-07 (1991) (citations omitted).

As the debtor emphasizes, there is no provision in the three lease documents that supports the lessor's contention that the parties intended to have one integrated lease agreement.  The three plant leases started in different years (1993, 1998 and 1999); they terminate on different dates (June 2013, February 2016 and March 2015); two of the leases require that the lessee relinquish the mushroom houses in "cleaned out" condition, while the other lease requires that it be returned in "fill" condition; and each lease has a separate right of termination provision.  Furthermore, all three leases contain separate purchase options for the lessee in the event that the lessor places a leasehold parcel for sale.  Thus, the lessor has the right under the lease agreements to sell one of the three leaseholds and to continue to rent the other two.

In addition, all three leases were amended in October 2006.  If the parties' intended that the leases should merge or become one lease, they could have easily made that intention known at that time.  As observed by the Pennsylvania Supreme Court:

> But it is alleged by the defendant that the lease of September
> 1, 1898, was intended to be an enlargement of the lease of
> March 1, 1893, and that the two leases are to be construed
> together as constituting one lease covering the entire tract of
> 2,666 acres. . . .  As already stated, it is scarcely conceivable
> that the parties in executing the lease of September 1, 1898,
> intended to make shaft No. 2, as located, the opening for

17

> taking out the coal from the demised premises, and if they
> intended that lease merely as an enlargement of the lease of
> March 1, 1893, it is likewise inconceivable that intelligent
> business men and eminent lawyers, after mature deliberation
> in reaching the terms of the contract and careful examination
> to see that the lease contained them and clearly expressed the
> intent of the parties to it, should have made such a bungling
> job of it.

Dorris v. Morrisdale Coal Co., 215 Pa. 638 (1906).  Absent such written provision

expressing an intention to merge the three leases, the three plants are treated as separate

and distinct leaseholds.  See generally Orndoff v. Consumers' Fuel Co., 308 Pa. 165, 174-

75 (1932) (intention of the parties to treat leases separately would prevail).

Whether, in light of Pennsylvania's statute of frauds, see 33 P.S. § 1[8], the

conduct of the parties could alter this result, see Herzog v. Witco Chemical Corp.,

Kendall Refining Co. Division, 447 Pa. 202, 204 (1972) ("Although appellants have

always treated the five separate leaseholds as one parcel of land, there are in fact five

separate leases involving five individual, although contiguous, parcels of land."), neither

the proximity of the mushroom plants, the occasional conduct of the debtor to tender

payment of combined rent (in contrast, Mr. Gabriel Fieni generally sent separate plant

rent invoices to the debtor for payment), the dumping of spent compost in one general

location, or the use of well water from the plant 2 leasehold, demonstrate (in the absence

of lease language to the contrary and the separate terms mentioned above) that both the

debtor and Mr. Fieni intended that there be but one lease agreement covering all three

---

[8]Leases of more than three years must be in writing to be enforceable.  See
generally Blumer v. Dorfman, 447 Pa. 131, 135 (1972).  Therefore, "[t]he rule that when a
contract is required by the statute of frauds to be in writing its terms cannot be orally modified" is
applicable to leases of more than three years.  See Brown, to Use of Par Bond & Mortgage Co. v.
Aiken, 329 Pa. 566, 580 (1938).

plants.  See generally Shafer v. Cascio, 288 Pa. 56, 64-65 (1927) ("To substitute an oral

lease for a written one protected by the statute of frauds, requires clear evidence—if not

clear, precise, and indubitable evidence; otherwise the statute would be vain indeed.");

Berman v. Urban Redevelopment Authority of Pittsburgh, 15 Pa. Cmwlth. 1, 324 A.2d

811, 812 (1974) (state condemnation of one leasehold does not represent condemnation of

four additional leaseholds for compensation purposes, even though the lessee had "one

integrated operation" on the "five contiguous or proximate parcels" and the lessee

maintained that the four remaining leaseholds were "useless" without the condemned

leasehold).

          In his attempt to overcome the existence of the separate and discrete written

lease agreements, Mr. Fieni argues that the debtor's motion to assume contains a judicial

admission that there is but one lease between the parties.  Although it is clear from the

motion that the debtor seeks to assume only the leasehold known as plant 1, Debtor's

Motion to Assume Non-Residential Real Property Leases, Grounds for Relief, ¶ 1  (dated

Feb. 16, 2010) (debtor requests to assume "Lease Three Plant 1"), Mr. Fieni relies upon

the following portion of the motion:

          5. The Debtor is a party to the following three (3) leases for
          the rental of nonresidential real property:

          a. The first lease is with C & L Rentals and is for placement
          of mushroom houses on non-residential, real property located
          at Ellicott Road in Avondale, Pennsylvania. ("Lease One").

          b. The second lease is with D & O Mandfredini and is for the
          placement of mushroom houses on non-residential, real
          property located at Cooper Road in Landenberg, Pennsylvania
          ("Lease Two").

          c. The third lease is with James Fieni and is for the placement
          of mushroom houses on non-residential, real property located

19

> on Starr Road as well as Penn Green Road in Lendenberg,
> [sic] Pennsylvania ("Lease three").

Id., Background, ¶ 5.

In addition to this paragraph, however, the debtor's motion also contained the following:

> Lease Three is comprised of three separate agreements
> identified as "Plant 1," "Plant 2" or 'Shittake Plant," and
> "Plant 3" or "Fieni Lower."

Id., ¶ 5 n.2.  Moreover, as just noted, the motion seeks assumption of only the plant 1 leasehold.

Mr. Fieni is correct that judicial admissions are binding upon the parties that make them.  Such admissions are defined though as follows:

> It has been held that judicial admissions are binding for the
> purpose of the case in which the admissions are made
> including appeals, . . . and that an admission of counsel during
> the course of trial is binding on his client. . . .  However, to be
> binding, judicial admissions must be unequivocal. . . .  The
> scope of judicial admissions is restricted to matters of fact
> which otherwise would require evidentiary proof, and does
> not include counsel's statement of his conception of the legal
> theory of a case.

Glick v. White Motor Co., 458 F.2d 1287, 1291 (3d Cir. 1972); see, e.g., In re Teleglobe Communications Corp., 493 F.3d 345, 377 (3d Cir. 2007) (judicial admissions "must be statements of fact that require evidentiary proof, not statements of legal theories.").   In contrast to an evidentiary admission, "[a] judicial admission, deliberately drafted by counsel for the express purpose of limiting and defining the facts in issue, is traditionally regarded as conclusive[.]"  Wright & Miller, 8B Federal Practice & Procedure Civ. § 2264 (3d ed. 2010).

20

In this instance, the statement made by counsel in the debtor's motion to assume and reject non-residential leases, which groups those leases by lessor, does not represent an unequivocal admission, and it concerns not simply a factual issue but a mixed issue of fact and law.  Thus, the motion does not contain a judicial admission that the parties had only one lease.  See In re Teleglobe Communications Corp., 493 F.3d at 377; LePage's Inc. v. 3M, 1998 WL 964198 (E.D. Pa. 1998); In re Pittsburgh Sports Associates Holding Co., 239 B.R. 75, 81 (Bankr. W.D. Pa. 1999) ("the proposition that the agreement between PHA and SMG is (or is not) a 'true' lease is a conclusion of law").[9]

---

[9]Indeed, in this bankruptcy case, Mr. Fieni filed a proof of claim stating that his claim is grounded upon "commercial leases" (plural) — not a "commercial lease" (singular).  Proof of Claim #29 dated February 19, 2010.  Attached to that proof of claim is a document styled "Proof of Claim Calculations for Rejected Leases," again using the plural noun, and itemizing his claim based upon separate rejection damages computed for the leases for plants 2 and for plant 3.  Implicit in this document is that the lease for plant 1 would be assumed, because no arrearage claim is mentioned for that mushroom plant.  Later, Mr. Fieni filed a second proof of claim dated May 5, 2010 and docketed as claim #35.  This second proof of claim asserts a claim for unpaid rent for plant 1 only, and states prepetition arrears for plant 1 of $30,800.  Thereafter, in a memorandum filed June 17, 2010, Mr. Fieni's counsel asserted that the prepetition arrears on plant 1 are $15,000.   As mentioned earlier, at the conclusion of the evidentiary hearing, counsel for the lessor maintained that the evidence supports an arrearage claim of $26,400.

Thus, Mr. Fieni's contention of a judicial admission made by debtor's counsel concerning the number of leases between these parties is unpersuasive.  Were it otherwise, were the debtor motion to constitute a judicial admission that there was only one lease between the parties, then the lessor's proofs of claims would be a counter-judicial admission that there were three leases; and its memorandum would limit his arrearage claim to $15,000.

Furthermore, even if the statement of counsel in the motion to assume and reject were a judicial admission, these particular circumstances would warrant relief from such an admission.  Mr. Fieni does not argue that he misunderstood prior to the hearing that the debtor was seeking to assume only the plant 1 leasehold, or that the debtor would deny the existence of three separate leases.  See generally Adani Exports Ltd. v. AMCI (EXPORT) Corp., 2009 WL 2485370, at *9 (W.D. Pa. 2009) (permitting amendment to admission when no prejudice would occur).  Moreover, inadvertent factual misstatements of counsel may be corrected in certain circumstances.  See Hub Floral Corp. v. Royal Brass Corp., 454 F.2d 1226, 1228-29 (2d Cir.

(continued...)

21

C.

Mr. Fieni also contends that the debtor's motion to assume plant 1 should be rejected because the debtor failed to demonstrate that assumption of plant 1, by itself, would be beneficial without plants 2 and 3.  He emphasizes that mushroom plant 1 needs the water from the plant 2 well to operate, and thus rejection of the latter lease will render the use of plant 1 impractical.  He further maintains that the three plants should be operated together "due to the cyclical nature of mushroom growing and economies of scale."  Fieni Pre-Trial Brief, at 7 (unpaginated).

The evidence presented does not support the lessor's contention.  The three plant leases, which did not commence at the same time and which refer to improvements to the leaseholds at different times, require independent rent payments.  The debtor offered unrebutted testimony regarding the profitable operations of plant 1 only.  It further asserts that it can obtain sufficient water to operate this plant even if the leaseholds for plants 2 and 3 are rejected.

The creditors' committee counsel, after consideration of the evidence presented, was persuaded that the debtor could operate plant 1 profitably and that plants 2 and 3 would not be profitable in the future.  Thus, the committee of unsecured creditors supports the debtor's decision.  And this support, coupled with the evidence presented,

---

[9](...continued)
1972); In re Ridgway, 325 B.R. 65, 67 (Bankr. D. Conn. 2005) ("At most, Hub Floral recognizes a possible exception to the general rule that counsel statements should be treated as judicial admissions.  Such an exception may be found where the affected party has (i) 'corrected' its alleged mis-statement prior to the court ruling on the subject matter, and (ii) demonstrated that the statement was inadvertent, i.e. unintentional.").

meets the debtor's burden under section 365(a) to assume the lease on plant 1 and reject

the plant 2 and plant 3 leases.[10]  See generally In re Harborview Development 1986 Ltd.

Partnership, 152 B.R. 897, 899 (D.S.C. 1993) (trustee's decision to reject a commercial

lease as not being beneficial to the estate was supported by the evidence); In re Patterson,

119 B.R. 59 (E.D. Pa. 1990) (rejection of executory contract found appropriate); In re

Beare Co., 177 B.R. 879, 882 (Bankr. W.D. Tenn. 1994) (debtor's motion to assume a

beneficial executory contract was within its business judgment and would be approved).


D.


Finally, Mr. Fieni argues that the debtor failed to demonstrate adequate

assurance of future payments under the lease for plant 1, nor the ability to promptly cure

its lease arrearage.

As the Third Circuit has explained, the Bankruptcy Code does not define

the phrase "adequate assurance of future performance."  Compliance with this provision

is determined on a case-by-case basis, dependent upon the facts and circumstances in

each instance.  See Cinicola v. Scharffenberger, 248 F.3d 110, 120 n.10 (3d Cir. 2001).

"A debtor need not prove that it will 'thrive and make a profit,' [In re] Natco, 54 B.R.

[436] at 440 [Bankr. S.D.N.Y. 1985], or provide 'an absolute guarantee of performance,'

In re Silent Partner, Inc., 119 B.R. 95, 98 (E.D. La. 1990).  It must simply 'appear[ ] that

---

[10]Committee counsel argued at the hearing that Mr. Fieni would be required to
permit the debtor to continue to use the well water from plant 2 in its plant 1 mushroom houses
even if the leasehold for plant 2 is rejected.  Mr. Fieni disagreed.  As the debtor stated in open
court that he has no present intention of using the plant 2 well water, I need not now decide that
issue.

the rent will be paid and other lease obligations met.' [In re] Westview [74th Street Drug
Corp.], 59 B.R. [747] at 755 [Bankr. S.D.N.Y. 1986]."  In re M. Fine Lumber Co., Inc.,
383 B.R. 565, 573 (Bankr. E.D.N.Y. 2008).

Among the non-exclusive factors that courts will consider are: payment
history; evidence of profitability; amount of rent owing in the future; and financial
condition of the lessee.  See generally Connellsville Plaza v. Jiffy Foods Corp., 92 B.R.
136, 138 (W.D. Pa. 1988) (financial condition of responsible parties was sufficient to
demonstrate adequate assurance of future performance);  In re M. Fine Lumber Co., Inc.,
383 B.R. at 573.

Here, the debtor has tendered to Mr. Fieni almost $150,000 in payments
over a three year period, or almost $50,000 per year.  The rent owing on plant 1 is $4,400
per fill, with between 4 and 5 fills expected per annum, for a yearly payment due of
$17,600 to $22,000.  Given the debtor's payment history, and that the debtor will no
longer be liable for future rent payments for plants 2 and 3, and given evidence of historic
gross income from each plant 1 fill, I find that the debtor has presented sufficient
evidence of adequate assurance of future performance under the plant 1 lease.

Insofar as the debtor's proposal to cure its default in plant 1 rent payments
at the rate of $2,000 per month, this would result in a cure of the delinquency in not more
than 14 months, and considerably less if the debtor prevails in its contention that the
conduct of the lessor precludes any postpetition payment obligation for a portion of 2010.
The debtor's motion, however, proposed to cure any default within 12 months.  Debtor's
Motion, at 3 ¶ 2.  It will be held to that 12 month proposal.

In light of the significance of this leasehold to the debtor—committee counsel argued at the hearing that the debtor could not reorganize without it—and in light of the remaining term of the lease, about 5 years, the debtor's cure proposal to become current in a period not to exceed 12 months meets the statutory requirement under section 365(b).  See In re Brown, 2006 WL 2546824, at *3-*4 (Bankr. S.D. Miss. 2006) (13 month cure is sufficiently prompt under the circumstances).

An appropriate order shall be entered.


_____
BRUCE FOX
United States Bankruptcy Judge

Dated: July 13, 2010

25